HERITAGE COMMONS PARTNERS, Ellen L. Barnes, William F. Cellini, Sheldon H. Ginsburg and Perry J. Snyderman, Plaintiffs–Appellees,

v.

VILLAGE OF SUMMIT, Defendant–Appellant.

No. 90–1741.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 27, 1991.

Decided June 17, 1991.

Jay A. Canel, Stephen D. Davis, Canel, Davis & King, Chicago, Ill., for plaintiffs-appellees.

Michael G. Cainkar, Vincent Cainkar, Gary S. Perlman, Mitchell H. Frazen, Robert G. Epsteen, Burditt, Bowles & Radzius, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, EASTERBROOK and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

Defendant Village of Summit ("Village") appeals from a $1 million jury award to plaintiffs Heritage Commons Partners and its four individual partners for breach of a contract to construct a retail and residential development on the site of an abandoned truck terminal located on 27 acres of land at 55th and Archer Avenue in Summit, Illinois. The dealings that gave rise to this litigation began in 1983, when a group of Village residents set out to find a developer willing to undertake construction on what is known as the "PIE" property. They contacted plaintiff Sheldon Ginsburg, a Certified Public Accountant, with their idea. He in turn contacted Perry Snyderman, a Chicago lawyer. They also invited Ellen Barnes, who was familiar with developing property with public sector financing, to join the partnership. Plaintiff William Cellini subsequently became a partner also. In the past, he has specialized in the construction and management of residential properties.

The abandoned truck terminal at issue was a "problem property," and the Heritage Commons Partners and the Village discussed the possibility of financing the property by obtaining federal grant assistance from the Department of Housing and Urban Development ("HUD"). The Village was one of eleven needy communities in Illinois eligible to benefit from two differ-

ent types of federal assistance for needy communities. Summit could apply for both a Housing Development Action Grant ("HODAG"), designed to facilitate the construction of proposed residential developments, and an Urban Development Action Grant ("UDAG"), conceived to benefit distressed communities like the Village in their development of commercial endeavors. In addition to a residential and retail facility, the Village residents who initiated the discussions with the Partners also envisioned a marina, hotel and convention facilities on the site.

The Partners worked out a funding scheme for the PIE development that included as an essential element the receipt of the HODAG and UDAG grants. On July 26, 1984, they formally presented their plan to Summit's Board of Trustees. They explained that the acceptance of a HODAG grant would obligate them to set aside 20% of the apartments for low-to-middle income persons. They advised the Village Board it would be necessary to pass resolutions assuring the federal government that Summit approved the submission of HODAG and UDAG applications and agreed to undertake the PIE development. In particular, the Partners said it would be necessary for the Village Board of Trustees to adopt the following resolutions:

A. Resolution authorizing the preparation of a boundary survey of the property and the preparation of a Redevelopment Plan leading to the creation of a TIF [tax incentive financing] District under the Illinois Tax Allocation Law;

B. Resolution authorizing condemnation of the property;

C. Resolution authorizing submission by the Village of an Urban Development Action Grant (UDAG) for the commercial components of the development;

D. Resolution authorizing submission by the Village of a Housing Development Grant (HODAG) for the residential component of the development.

That same evening the Village Board of Trustees passed the substance of these resolutions unanimously in the form of an ordinance and three resolutions reproduced in the Appendix to this opinion. The Partners were told that the Village wanted both the housing and retail components.

Thereafter plaintiff Barnes' own company and the Village cooperated in preparing the HODAG and UDAG applications. The HODAG application included the Partners' commitment to invest $2,513,715 in the residential development, and the application was filed on August 14, 1984.

The UDAG application contained similar commitments by the Village and the Partners with respect to the retail component, and the Partners agreed to contribute $1,286,886 to that project. On August 20 and 21, at public hearings on the UDAG grant for the shopping center, Village residents announced their opposition to the low-income apartments which would be built in accordance with the requirements of the HODAG program. The UDAG application was filed on August 31, 1984.

On November 8, 1984, HUD approved a $9.5 million HODAG grant for the apartments—the largest single grant award in the nation (Plaintiffs' Br. 8). Also in November 1984, HUD approved the Village's UDAG application at the regional level, but the UDAG office in Washington, D.C. requested written clarification of the eligibility for financing the retail project through a first mortgage industrial revenue bond to be issued by the Village or an approved Illinois agency. As a result, HUD held over Summit's UDAG application until May 1985.

After HUD announced the HODAG grant, the Village Board met on November 19, 1984. Village Trustee Ronald Bragassi[1] presented a motion to refuse the HODAG grant, but his motion failed. However, grass-roots opposition to the HODAG development arose at the meeting of the Village Board on December 3, 1984, when most of the Village citizens who were

---

**1.** Bragassi, who became Summit's president in April 1985, was named as a defendant in Counts II and III of the first amended complaint, but the jury returned a verdict in his favor. He was not a party to Count IV, the only provision of the complaint involved here.

present expressed opposition to the HOD-AG grant for the apartments, prompting the Village Board to vote to refuse the grant. The Board did not relay to HUD its decision to forego the grant until April 15, 1985. The Village's refusal of the grant was unconditional. It did not advise HUD that it would accept the HODAG grant for the residential component only if the UDAG grant were approved for the retail portion.

After learning of the Village's decision, the Partners did not pursue the UDAG grant for the retail development on the PIE property, because the Village had refused the HODAG grant for the housing development. The Village's rejection of the HOD-AG grant formed the basis for the Partners' unsuccessful race discrimination claim asserted in their complaint. The Partners argued that the Village made an about-face on the housing development, because it didn't want to comply with the requirement that it set aside a percentage of the units for low-income tenants.

The Partners filed their first amended complaint against the Village in May 1985. The first three counts alleged race discrimination in violation of 42 U.S.C. § 1983 while Counts IV and V asserted pendent claims for breach of an express or implied contract, with the Partners advancing a theory of "unjust enrichment" on the latter count.[2] The jury returned a verdict in favor of the Village on four of the counts but returned a verdict for plaintiffs on Count IV, the pendent claim for breach of contract, and awarded them compensatory damages of $1,000,000. Judgment was subsequently entered against the Village for that amount. The questions before us are whether the Village breached a contract with plaintiffs and, if so, whether the $1,000,000 verdict was supported by the evidence.

Plaintiffs' trial theory on the contract claims alleged that the Village breached a contract with the Partners by refusing the HODAG grant and not permitting them to develop the property. As the trial judge found, plaintiffs showed they would otherwise have had $1,733,258 in profits as provided in the HODAG grant application. However, as noted, the jury returned a verdict in the plaintiffs' favor for $1,000,000. We agree with the judge below that this verdict was "well within the range of damages supported by the evidence." District Court Opinion and Order of March 5, 1990 (R. 109 at 4, 5).

## Breach of Contract

On appeal, the Village argues that in passing the resolutions and ordinance authorizing the grant applications and the condemnation of the PIE property, the Village only intended to "start the ball rolling" (Tr. 184). Defendant distinguishes between what it views to be the mere authorization of a project and an intent to be bound legally to the contract project. In attempting to evade any contractual obligations, the Village tried unsuccessfully to convince the jury that its resolutions and ordinance approving the project did not constitute the mutual assent necessary to form a contract. To prevail on this theory, the jury would have essentially had to accept the proposition that an unexpressed intent not to be bound outweighed any express manifestation of a desire to enter into a mutually binding contractual agreement.

■ The trial judge dismissed the validity of defendant's theory as a matter of law in his jury instruction concerning the plaintiffs' express contract claim. Without objection,[3] he gave the following instruction in open court:

Now, the Plaintiffs also claim damages that they claim they suffered because the Village of Summit allegedly breached a contract with the Plaintiffs. The contract may be written, oral, or partly written or partly oral.

A contract, to be binding, must include a showing that both parties have agreed to the terms and conditions of the con-

---

2. At one of the conferences on instructions "express" was removed from Count IV and Count V was converted to "unjust enrichment" (Tr. 683).

3. See Tr. 139–155, 420–435, 650–652; see also Plaintiffs' Br. 12–13.

tract. This is called a meeting of the minds. There must be a meeting of the minds. There can be no contract if only one contractant has shown an intent to be bound. The Plaintiffs claim that the four regulations and ordinances that the Village Board of trustees passed at the July 26, 1984, meeting manifested the Village's intent to be bound. The meeting of the minds may be made wholly or partly by written or spoken words or other acts or conduct that show intent to be bound.

If a party, by an outward expression, statement, or conduct has displayed intent to be bound, the fact that he might have an unexpressed internal intent not to be bound does not mean there has been no meeting of the minds. The Plaintiffs have the burden of proving by a preponderance of the evidence each of the following propositions relating to their contract claim—First, that on July 26, 1984, the date of one of the public meetings, you heard about the Plaintiffs' offer to commit their own creditor money and to go forward if the Village of Summit promised to go forward with the development, if the government approved the HODAG and UDAG grants; second, that the Village accepted the offer by agreeing, in accepting [to accept] the grants, if the applications were approved in order to allow the Plaintiffs to develop the property as an apartment complex-shopping center and; third, that the Village breached its agreement with the Plaintiffs; fourth, that the Plaintiffs either performed their obligation under the contract or were prevented from performing by reason of the Village of Summit's failure to accept the HODAG grant; fifth, that the Plaintiffs suffered injuries or damages as a result of the Village of Summit's breach of contract.

If you find that the Plaintiffs have proven each of these five elements by a preponderance of the evidence, you should return a verdict for the Plaintiffs on their contract claim. If you find for the Plaintiffs on the contract claim, you must then decide what amount of money will reasonably and fairly compensate them for the injury they suffered as a result of the Defendants' [*sic*] breach of contract.

Breach of contracts damages should put the Plaintiffs in a position they would have been in had the Defendants [*sic*] not breached the contract.

(Tr. 704–705.) The Village is bound by this instruction since it did not object to it at the time it was given. Fed.R.Civ.Proc. 51. Pursuant to the instruction the jury acted well within its discretion to find that all five elements were present because it returned a verdict for the plaintiffs on their contract claim. Perhaps the most pertinent part of the instruction is contained in the following sentence:

If a party, by an outward expression, statement, or conduct has displayed [an] intent to be bound, the fact that he might have an unexpressed internal intent not to be bound does not mean there has been no meeting of the minds (Tr. 704).

Therefore, under the plain language of the instruction it is immaterial that the Village might have had an unexpressed internal intent not to be bound.

■■■ The Partners' theory was that the contract between the parties arose on July 26, 1984, the date on which the Village gave its official go-ahead for the grant applications and the arrangements for taking possession of the PIE property. At that time the Partners offered to build and manage the proposed residential and retail development if the Village agreed to accept the HODAG and UDAG grants. On the same date the Board unanimously passed the requisite resolutions and ordinance requested by the Partners, and the Village president signed the applications for the HODAG and UDAG grants before submitting them to HUD. The Village president had the authority to do so for he acted with the approval of Summit's Board. *D.C. Consulting Eng'rs, Inc. v. Batavia Park Dist.*, 143 Ill.App.3d 60, 63, 97 Ill.Dec. 341, 343, 492 N.E.2d 1000, 1002 (2d Dist.1986). Moreover, the Village's adoption of the resolutions and ordinance was in full accord with the general rule in Illinois that a village or municipality can contract and ap-

propriate funds only by ordinance. Ill.Rev. Stat. ch. 24, ¶ 8–1–7(a) (1989). *Kinzer v. City of Chicago*, 169 Ill.App.3d 447, 453, 120 Ill.Dec. 8, 11, 523 N.E.2d 919, 922 (1st Dist.1987), modified and rev'd on other grounds, 128 Ill.2d 437, 132 Ill.Dec. 410, 539 N.E.2d 1216 (1989); *Chicago Food Management, Inc. v. City of Chicago*, 163 Ill.App.3d 638, 643–644, 114 Ill.Dec. 725, 729, 516 N.E.2d 880, 884 (1st Dist.1987), appeal denied, 119 Ill.2d 554, 119 Ill.Dec. 382, 522 N.E.2d 1241 (1988); *Tecumseh Int'l Corp. v. City of Springfield*, 70 Ill. App.3d 101, 106, 26 Ill.Dec. 745, 748, 388 N.E.2d 460, 463 (4th Dist.1979).

■ In deciding in favor of breach of contract, the jury must have concluded there was no credible evidence that the Village reserved the right to refuse the grant. This was in accord with a Summit resolution, contained in the HODAG application, authorizing the Village president to apply "for the grant to execute the Development Program, as proposed by Heritage Commons Partners, acting as Developer, including all understandings and assurances contained therein." The application also contained the Village president's letter to the Partners stating:

> Please be advised that the Board of Trustees of the Village of Summit has taken the necessary steps to accomplish site control of the property required for your proposed project and is prepared to complete the acquisition, zoning and conveyance steps upon preliminary funding approval of the Housing Development Grant as applied for by the Village.

The jury agreed with the Partners that the Village breached the contract by refusing the HODAG grant, causing them to suffer lost profits, and its conclusion was supported by substantial evidence. The jury was entitled to believe the testimony of plaintiff Barnes and Village Trustee Lambert that the development was to be built if the grants were awarded.

■ One of the Village's contentions is that no contract was formed because on July 26, 1984, the proposed development included a marina which was never approved by the Summit Park District. It

argues that Park District approval was a necessary precondition to the creation of a binding obligation on the part of the Village, since the Park District was the body responsible for approving the marina proposed as a part of the development. However, the plaintiffs never conditioned the residential and retail developments, which were indisputably the most substantial parts of the project, on the construction of the marina, which was dropped after the Park District objected.

Moreover, the plaintiffs properly identify this argument as a "red herring." The basis for plaintiffs' breach of contract claim is Summit's refusal of the HODAG grant, rejected by the Village after it passed an express resolution authorizing the application and permitting the Partners to go forward with their plans for the development. The Village produced no evidence demonstrating any causal relationship between its decision to pass up the grant and the Park District's objection to the marina.

■ The jurors' verdict was based on their acceptance of the Partners' theory that a contract existed between the parties when the Village applied for the grants, which included the expressly authorized commitment by the Village president to proceed upon HUD's approval of the applications. The Village argues on appeal that its actions approving the grant application did not rise to the level of the acceptance of an offer. Furthermore, the Village asserts that it retained a right to refuse the grant awards in support of its claim that the events of July 26, 1984, did not give rise to a contract. However, Illinois law recognizes that the assent to the terms of an agreement will constitute the acceptance of a contract unless the party *"expressly* makes [acceptance] conditional on assent to the additional or different terms." *McCarty v. Verson Allsteel Press Co.*, 89 Ill. App.3d 498, 510, 44 Ill.Dec. 570, 579, 411 N.E.2d 936, 945 (1st Dist.1980) (emphasis in original). Since the Village reneged on its agreement to accept the HODAG grant, it is immaterial that the parties failed subse-

quently to enter into a formal written contract.

■ In denying the Village's motion for judgment notwithstanding the verdict on February 6, 1990, the judge below handed down an opinion holding that the resolutions passed by the Village Board on July 26, 1984, evidenced a contract, concluding that:

> The fact that these three enactments [4] do not have the form of a contract—do not explicitly promise that the board will accept the HUD grants if they come through—is immaterial. The board would hardly pass a formal resolution to apply for a grant that it did not intend to accept, or to abate taxes on a development it did not intend to approve, or to acquire by eminent domain property intended for use in a development that the board did not intend to go forward with. The only plausible interpretation of the three enactments is that they memorialized and implemented a formal contract to proceed with the project, provided HUD approved the grant applications.

(R. 97 at 4). He agreed with the jury's breach of contract verdict, stating:

> There was ample evidence from which a reasonable jury could conclude that the plaintiffs and the members of the Village board believed they had a firm contract conditional only on HUD's granting the applications, and that on the strength of this understanding the plaintiffs had expended substantial time, money, and effort preparing the applications and lining up financing for the project. For the board to terminate the contract after HUD *granted* the main application and while it was considering the other application was a clear breach.

District Court Opinion and Order of Feb. 6, 1990, 730 F.Supp. 821 (R. 97 at 3) (emphasis in original).

The jury could properly consider that the breach of contract occurred when the Village refused to accept the HODAG grant for the residential part of the development. Therefore it does not matter that the Part-

ners did not afterwards proceed to complete the processing of the UDAG application for the retail component. Indeed, the Village never told the Partners or HUD that it would accept the HODAG grant if the UDAG grant was subsequently approved.

■ While the Village contends that the Partners' June 19, 1985, proposal for a down-sized development amounted to a novation, this proposal by the plaintiffs did not constitute a waiver of their claim against Summit for breaching its obligation to accept the HODAG grant. Moreover, the novation defense was never presented below and therefore was waived by the Village.

*Amount of Damages*

■ As noted above, the jury awarded plaintiffs $1,000,000 in damages. The Partners offered evidence that they had been injured in amounts ranging from $3,200,000 to $3,550,000 (Br. 12, 17–18). In disputing the propriety of the jury's award, the Village invoked Illinois law and the *grande dame* of case law concerning foreseeable damages under contract law, *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854). *Hadley*, approved under Illinois law, cf. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 318, 113 Ill.Dec. 252, 258, 515 N.E.2d 61, 67 (1987), sets forth the general rule of foreseeability in contract cases: "[A]ll damages which naturally and generally result from a breach are recoverable." *Midland Hotel*, 118 Ill.2d at 318, 113 Ill.Dec. 252, 515 N.E.2d 61. However, the rule has a somewhat narrower application in cases where the damages result from "special or unusual circumstances." *Id.* In such a case, an aggrieved party under the rule established in *Hadley* bears the burden of showing that "the damages were within the reasonable contemplation of the parties." *Id.*

There is nothing in the trial judge's ruling or in the record of the case to suggest that the plaintiffs here should bear this higher burden on the ground that the dam-

---

**4.** A fourth enactment was in the form of an ordinance reproduced in the Appendix *infra.*

ages were collateral, special or unusual in relation to the breach. In his opinion denying the Village's motion to limit damages to $109,049.36, the alleged out-of-pocket expenses of the Partners, the judge below noted that the HODAG grant application, which the jury found was breached, provided for profits of $1,733,258. District Court Opinion and Order of March 5, 1990 (R. 109 at 4). The Village knew of this amount because it was contained in the HODAG application submitted by Summit to HUD. Indeed, if the UDAG application had not been aborted, the plaintiffs were guaranteed an additional profit of $900,000 or a total of $2,600,000 (R. 109 at 4–5). Consequently, it was proper for the judge to conclude that the $1,000,000 awarded was well within the range of damages shown by the evidence.

Judgment affirmed.

# APPENDIX

VILLAGE OF SUMMIT, ILLINOIS

RESOLUTION NO. 84-R-48

----------------------------------------------------------------

A RESOLUTION OF THE BOARD OF TRUSTEES OF THE VILLAGE
OF SUMMIT AUTHORIZING THE PRESIDENT TO
PRECEDE WITH A HOUSING DEVELOPMENT GRANT (Hodag)
APPLICATION TO THE UNITED STATES DEPARTMENT
OF HOUSING AND URBAN DEVELOPMENT (HUD)

----------------------------------------------------------------

WHEREAS, the Board of Trustees hereby authorizes the President to precede with an application to HUD for the purpose of obtaining funding to encourage private investment in the development of a portion of Summit described as follows:

Former Ryder/PIE Truck Terminal and adjacent properties.

WHEREAS, the Village of Summit will under the terms and conditions of HoDAG Program submit to HUD its approval an application for funds to provide a grant to expressly aid in the residential development area.

WHEREAS, the Village of Summit is eligible to precede per the provisions and guidelines of Section 17 of the United States Housing Act of 1937 which was enacted into law in Section 301 of the Housing and Urban/Rural Recovery Act of 1983. Development Act of 1974 be it therefore resolved that the Village of Summit, Illinois submit said application to HUD or said funds to aid in the development of the aforesaid area.

NOW THEREFORE, Be It Resolved by the Board of Trustees of the Village of Summit, Illinois that:

9

1498

1. The United States of America and the Secretary of Housing and Urban Development be, and hereby are, assured of full compliance and administration of citizens participation, acquisition process, accounting procedures, the Hatch Act, minimum wage and minimum hour provisions of the Fair Labor Standards Act, Civil Rights Acts, and requirements of the National Environmental Policy Act, 1958.

2. The President is authorized and directed to prepare an application for the grant to execute the Development Program, as proposed by Heritage Commons Partners, acting as Developer, including all understandings and assurances contained therein.

3. An application on behalf of the Village, for a HoDAG Grant, in the approximate amount of seven million dollars in connection with a contemplated residential development and such other amounts as may be required in connection with the appropriate mixed use development of the balance of the property, is hereby approved and that the President of the Village of Summit is hereby authorized to execute and file such application with HUD, to provide such additional information and to furnish such documentation as may be required by HUD, and act as the authorized correspondent of the Village of Summit relating to the application.

Passed this 26th day of JULY, 1984.

AYES: TRUSTEES DINEFF, YERKOVICH, BRAGASSI, ALDRIDGE, LAMBERT & KLUSZEWSKI

NAYS: NONE

ABSENT: NONE

APPROVED THIS 26th DAY OF JULY, 1984.

Village President

ATTEST:

Village Clerk

10

VILLAGE OF SUMMIT
ORDINANCE NO. _8A-O-12_____

---------------------------------------------------------------------

AN ORDINANCE AUTHORIZING THE PURCHASE OF
PROPERTY THROUGH CONDEMNATION OR OTHER PROCEEDINGS

---------------------------------------------------------------------

ADOPTED THIS 25th DAY OF JULY,198 4 BY THE PRESIDENT
AND MEMBERS OF THE BOARD OF TRUSTEES OF THE VILLAGE OF SUMMIT.

169

1500

VILLAGE OF SUMMIT

ORDINANCE NO. 84-0-12

------------------------------------------------------------------

AN ORDINANCE AUTHORIZING THE PURCHASE OF

PROPERTY THROUGH CONDEMNATION OR OTHER PROCEEDINGS

------------------------------------------------------------------

WHEREAS, it is the best interest of the Village of Summit to acquire the property described in the survey and legal description attached herewith;

WHEREAS, by acquiring the land, the Village can use the property for public recreational purposes including, but not limited to a Marina;

WHEREAS, development of the land would greatly improve the economic development within the Village;

NOW, THEREFORE, Be It Ordained by the President and Board of Trustees as follows:

Section 1. That the Village of Summit acquire the property that is shown in the survey attached herewith and which is described in the attachment also attached herewith.

Section 2. That Fred Sudak and Associates and the President of the Board of Trustees are hereby authorized to enter into negotiations with the owners of the described properties in order for the Village to acquire the title to such properties.

Section 3. The President of the Board of Trustees has the authority to initiate condemnation proceedings at any time after negotiations to acquire the property has commenced.

/70

